UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

KRUTI DESAI et al.,                                                          Plaintiffs,

v.                                                        Civil Action No. 3:14-cv-459-DJH

CHARTER COMMUNICATIONS, LLC,                                      Defendant.

* * * * *

## MEMORANDUM OPINION AND ORDER

Plaintiffs Kruti Desai, Melanie Fink, Belinda Gale Parkerson, Jeremy Parkerson, Daniel Popp, and Carolyn Vincent alleged that their former employer, Charter Communications, LLC, falsely accused them of theft after their employment was terminated. (Docket No. 7) Following a weeklong trial, a jury agreed, finding Charter liable for defamation per se. (D.N. 168) Charter has moved for judgment as a matter of law or a new trial. (D.N. 183) In the alternative, it seeks reduction of the damage award. For the reasons explained below, the Court will reduce the punitive damages and deny Charter's motion in all other respects.

## I.    BACKGROUND

The Court previously summarized the facts of this case as follows:

Plaintiffs worked at Charter's call center in Louisville, Kentucky, in various capacities. Each was given a Hewlett-Packard (HP) computer printer by Linda Showalter, an administrative assistant at Charter. Plaintiffs maintain that they believed Showalter's distribution of printers was authorized by management. Charter, however, considered Plaintiffs' acceptance of the printers to be a violation of its policy against removing company property without authorization, and it terminated most of the employees involved.

Approximately one month after Plaintiffs were fired, Charter Human Resources Manager Rodger Simms gave a PowerPoint presentation during a Charter leadership conference. On a slide with the heading "Leadership and Judgment," Simms referred to "'Operation . . . ' Green-light, Buzz-kill, Printer-gate." He encouraged employees to "[a]ct with Integrity and Character." The notes for Simms's oral presentation accompanying the slide state: "Let's get the elephant

1

in the room out in the open, how many of you have heard of . . . Operation codes for things that weren't right! All examples of poor judgment. Not bad people, people we know and love but they made the wrong choices." Simms emphasized the importance of "integrity," "character," and having "the courage to do the right thing." He also warned that "[k]nowing something isn't right and allowing it to continue is the same as you doing it!" "Green-light" referred to an incident in which a Charter employee used a company credit card for personal benefit and was terminated as a result. "Buzz-kill" involved the sale of illegal drugs on Charter property by Charter employees; those employees were also terminated.

Plaintiffs sued Charter for defamation on the ground that "Charter made false statements alleging misconduct on the part of the Plaintiffs relating to the . . . distribution of Hewlett-Packard ink jet printers, including but not limited to the [PowerPoint] presentation." They contend that the use of the term "Printer-gate," particularly in conjunction with references to employee theft and drug-dealing, implied that their actions were criminal.

(D.N. 129, PageID # 2710-11 (internal citations and footnote omitted))

The case was tried solely on a theory of defamation per se. At the close of Plaintiffs' case, Charter moved for judgment as a matter of law, arguing that "Printer-gate" could not constitute defamation per se because it had no "objectively understood definition" (D.N. 148-1, PageID # 3243) and was not defamatory on its face (*id.*, PageID # 3243-45); that Plaintiffs had no proof of damages to support a claim of defamation per quod (*id.*, PageID # 3245-47); and that any inference arising from "Printer-gate" was true because the term referred to "an incident involving the unauthorized removal of company printers from Charter's premises." (*Id.*, PageID # 3248; *see id.*, PageID # 3247) The Court denied that motion and later granted Plaintiffs' motion for judgment as a matter of law on Charter's truth defense, concluding that there was insufficient evidence from which a reasonable jury could find that Plaintiffs' actions constituted criminal theft. (D.N. 175, PageID # 4091-92) The jury ultimately found Charter liable, awarding each plaintiff $350,000 in compensatory damages and $1 million in punitive damages. (D.N. 168) The Court entered judgment for Plaintiffs in accordance with the jury's verdict (D.N. 179), and Charter timely sought relief under Rules 50 and 59 of the Federal Rules of Civil Procedure. (D.N. 183)

## II.      ANALYSIS

Charter renews its Rule 50 motion for judgment as a matter of law on the issue of whether the term "Printer-gate" can constitute defamation per se.  (D.N. 183-1, PageID # 4372-86; *see* D.N. 148)  It further argues that it is entitled to a new trial on the grounds that it should have been allowed to present the defenses of truth and qualified privilege; that James Eversole's testimony was admitted in error; and that the jury was required to find malice by clear and convincing evidence in order to award punitive damages.  (*See* D.N. 183-1, PageID # 4386-4404)

Because this is a diversity case, Kentucky law governs the Court's Rule 50 analysis.  *See Lindenberg v. Jackson Nat'l Life Ins. Co.*, 912 F.3d 348, 360 (6th Cir. 2018) ("In this Circuit, a federal court sitting in diversity must apply the standard for judgments as a matter of law of the state whose substantive law governs." (quoting *DXS, Inc. v. Siemens Med. Sys., Inc.*, 100 F.3d 462, 468 (6th Cir. 1996))).

> Under Kentucky law, "a motion for a directed verdict . . . should be granted only if there is a complete absence of proof on a material issue in the action, or if no disputed issue of fact exists upon which reasonable minds could differ.  In deciding such a question, every favorable inference which may reasonably be drawn from the evidence should be accorded the party against whom the motion is made."

*Ventas, Inc. v. HCP, Inc.*, 647 F.3d 291, 314 (6th Cir. 2011) (quoting *Morales v. Am. Honda Motor Co.*, 151 F.3d 500, 506 (6th Cir. 1998)); *see also Toler v. Süd-Chemie, Inc.*, 458 S.W.3d 276, 285 (Ky. 2014) (citations omitted).

There is likewise a high bar for relief under Rule 59:

> [the Sixth Circuit] ha[s] interpreted Rule 59 to mean that "a new trial is warranted when a jury has reached a 'seriously erroneous result' as evidenced by: (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, i.e., the proceedings being influenced by prejudice or bias."

*Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595, 606 (6th Cir. 2018) (quoting *Holmes v. City of Massillon, Ohio*, 78 F.3d 1041, 1045-46 (6th Cir. 1996)). Charter has not demonstrated that either remedy is warranted here.

## A. Defamation Per Se

As it has on numerous prior occasions, Charter argues that the term "Printer-gate" cannot constitute defamation per se. Charter first asserts that there was no evidence to support a finding that Simms's presentation imputed criminal conduct to Plaintiffs. (D.N. 183-1, PageID # 4372-76) It further contends that the Court, not the jury, should have determined whether defamation per se occurred. (*Id.*, PageID # 4376-86) Neither argument is persuasive.

### 1. Sufficiency of the Evidence

According to Charter, "on the evidence presented at trial, no reasonable jury could have concluded that the use of the term 'Printer-gate' suggested that the Plaintiffs had engaged in theft." (*Id.*, PageID # 4372) But that was not the issue before the jury; the Court had already found, as a matter of law, that the term was "capable of bearing a defamatory meaning." (D.N. 129, PageID # 2717 (quoting *Yancey v. Hamilton*, 786 S.W.2d 854, 858-59 (Ky. 1989)); *see id.*, PageID # 2718 ("Construing the[] facts in the light most favorable to Plaintiffs, Simms's reference to 'Printer-gate' imputed criminal conduct—theft—to Plaintiffs.")) The jury was tasked with deciding whether the "Printer-gate" reference "was reasonably understood by persons who heard it as accusing the plaintiffs of criminal theft."[1] (D.N. 167, PageID # 3519)

Charter observes that "multiple witnesses who attended the presentation testified that they did not understand the term to suggest anything criminal at all." (D.N. 183-1, PageID # 4373) It cites the testimony of current Charter employees Mike Barnard, Sandi Streicher, and Theo Carney

---

[1] The respective functions of the Court and the jury will be addressed in greater detail below.

defining "Printer-gate" as they understood it. (*Id.*) Charter acknowledges, however, that two witnesses who attended the meeting—Samantha Little and James Eversole—testified that they understood the term to imply that Plaintiffs had stolen from the company. (*Id.*, PageID # 4373-74) Contrary to Charter's representation, Little did not merely "testif[y] vaguely that the term 'insinuates that some type of illegal activity had been performed'" (*id.*, PageID # 4374); she also testified that she interpreted it as referring to theft.[2] (D.N. 172, PageID # 3661-62) And Eversole, in addition to his statement that the presentation "kind of compar[ed] [Plaintiffs] to gambling and murder"[3] (*id.*, PageID # 3677), stated that

> the message that was given during the summit didn't really filter into the conversations that were afterward. Those particular conversations were like, oh, well, *that was the time that we fired a bunch of people because they stole equipment*. Like don't do it, like don't take anything from the company.

(*Id.*, PageID # 3677-78 (emphasis added)) Thus, both Little and Eversole provided testimony supporting the jury's verdict.[4]

---

[2] The following exchange took place on Little's redirect examination:
    Q.    Just briefly. Ms. Little, you testified a few minutes ago, when asked did the presenters of this—Mr. Simms'[s] presentation of this PowerPoint dealing with Green Light, Buzz Kill, and Printergate, that they did not use the words thief in so many words.
    A.    That's correct.
    Q.    Was that the interpretation that you got from those words they did use?
    A.    That's what I got from it.
(D.N. 172, PageID # 3661-62)
[3] It was revealed at trial that Mike Barnard, during a separate presentation at the same leadership conference, gave Pete Rose and O.J. Simpson as further examples of good people who had done bad things. Eversole testified that he interpreted this as another reference to Plaintiffs and the printer incident (D.N. 172, PageID # 3664-65); Barnard maintained that he did not link the two. (D.N. 173, PageID # 3967-68, 74-75)
[4] The Court agrees with Charter that the testimony of Plaintiffs—who did not attend the leadership conference—is not relevant to show how the statement was interpreted by those who did attend. (*See* D.N. 183-1, PageID # 4375 & n.4)

Charter next asserts that Little's testimony cannot support the verdict because "the vague inference of illegal activity that Little drew from the presentation depended entirely on coupling "Printer-gate" with the two other incidents mentioned in the same presentation (Green-light and Buzz-kill) *and* upon knowledge of what those incidents involved." (D.N. 183-1, PageID # 4374) According to Charter, "Kentucky courts long ago decided that merely mentioning an incident involving the plaintiff in the same context as incidents involving illegal conduct cannot be treated as implying that [the] plaintiff engaged in some illegality." (*Id.*) The single case it cites in support of this contention, *Boyd v. Hutton*, 244 S.W. 880 (Ky. 1922), made no such proclamation and involved starkly different facts.

In *Boyd*, the plaintiff alleged that he was defamed by a 1920 newspaper report, clearly offensive by today's standards, that read: "Last Thursday night there were lots of fireworks in Harrodsburg. Jim Boyd, colored, claimed that someone shot him through an open window while he was reading, or lacing his shoes. The shots covered nearly all of his entire body." *Id.* at 881. The report appeared under the same headline—"Shootings in Town"—as reports that another person had "shot at a chicken thief the same night" and a third person "shot at a prowler on his premises." *Id.* Boyd argued that "the reporting of the three news items in one article was intended to connect him with one of the other two shootings, and did in fact impute to him conduct of a disgraceful or degrading nature." *Id.* In a four-paragraph opinion affirming the directed verdict in favor of the defendant, the court found Boyd's "construction of the article . . . to be wholly fanciful, for it certainly is not warranted by any fair interpretation of the publication itself." *Id.*

The Court finds Charter's reliance on *Boyd* curious in light of the case's historical context; given this context, and the opinion's limited analysis, it has little precedential value. In any event, the facts are clearly distinguishable from those at issue here. Simms's presentation explicitly

linked "Printer-gate" to the drug and embezzlement incidents, describing them as "[a]ll examples of poor judgment" in which the individuals involved "made the wrong choices." (D.N. 90-3, PageID # 1984) Moreover, as discussed above, there was testimony that some Charter employees who attended the presentation construed the "Printer-gate" reference as imputing criminal conduct to Plaintiffs; in *Boyd*, there was apparently no testimony beyond the plaintiff's own. *See* 244 S.W. at 881. In short, *Boyd* does not preclude consideration of the context in which the "Printer-gate" reference was made—indeed, even Charter has acknowledged that allegedly defamatory words "*must* be evaluated in context." (D.N. 94, PageID # 2187)

Viewing the evidence in the light most favorable to Plaintiffs and drawing all reasonable inferences in their favor, the Court concludes that there was sufficient evidence to support the jury's verdict.

### 2. Definition of Defamation Per Se

Charter's overarching argument is that the "Printer-gate" reference in Simms's presentation cannot constitute defamation per se because it requires consideration of extrinsic circumstances. (*See* D.N. 183-1, PageID # 4373-86) The definition of defamation per se has been a point of contention throughout this case, despite the Kentucky Supreme Court and Court of Appeals' numerous declarations that a statement falsely imputing crime—particularly theft—constitutes defamation per se. *See Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 795 (Ky. 2004) ("[A] 'false accusation of theft is actionable per se—that is, libelous or slanderous per se.'" (quoting 50 Am. Jur. 2d *Libel and Slander* § 185 at 465 (1995))), *overruled on other grounds by Toler*, 458 S.W.3d at 287; *Welch v. Am. Publ'g Co. of State*, 3 S.W.3d 724, 735 (Ky. 1999) ("When criminal activity is alleged, the publication is libelous per se." (citations omitted)); *Fortney v. Guzman*, 482 S.W.3d 784, 789-90 (Ky. Ct. App. 2015) ("'When the communication concerns

7

untrue allegations of criminal behavior or unfitness to perform a job, the communication is libelous per se or slanderous per se.' This simply means 'there is a conclusive presumption of both malice and damage.'" (citations omitted)); *Harstad v. Whiteman*, 338 S.W.3d 804, 810 (Ky. Ct. App. 2011) ("When the communication concerns untrue allegations of criminal behavior or unfitness to perform a job, the communication is libelous per se or slanderous per se, and proof of context indicating malice is not required."); *Gilliam v. Pikeville United Methodist Hosp. of Ky., Inc.*, 215 S.W.3d 56, 61 (Ky. Ct. App. 2006) ("Statements classified as defamatory per se include those which attribute to someone a criminal offense, a loathsome disease, serious sexual misconduct, or conduct which is incompatible with his business, trade, profession, or office." (citing Restatement (Second) of Torts § 570 (1977))); *Columbia Sussex Corp. v. Hay*, 627 S.W.2d 270, 274 (Ky. Ct. App. 1981) ("Although . . . it is not necessary that involvement in a crime be imputed to establish slander per se, certainly when such activity is indeed suggested, the requisites are met.").

Notwithstanding this extensive precedent, Charter insists that "Printer-gate" cannot be defamation per se because it is not defamatory on its face. Quoting *Stringer*, Charter repeatedly asserts that "'if a comprehension of the defamatory nature of the written or spoken words requires extrinsic evidence of context or circumstances,' then the statement can solely be 'libelous or slanderous per quod' and 'special damages, *i.e.*, actual injury to reputation, must be affirmatively proved.'" (D.N. 183-1, PageID # 4380 (quoting *Stringer*, 151 S.W.3d at 795); *see also id.*, PageID # 4383, 4385)) By taking this passage out of context, however, Charter misses its point:

> In comparison to slanderous per se oral statements, which must contain defamatory language of a specific nature, the common law treats a broader class of written defamatory statements as actionable per se: "while spoken words are slanderous per se only if they impute crime, infectious disease, or unfitness to perform duties of office, or tend to disinherit him, written or printed publications, which are false and tend to injure one in his reputation or to expose him to public hatred, contempt, scorn, obloquy, or shame, are libelous per se." All other defamatory statements are merely libelous or slanderous per quod, and special damages, <u>i.e.</u>, actual injury to

reputation, must be affirmatively proved if a comprehension of the defamatory nature of the written or spoken words requires extrinsic evidence of context or circumstances. We need not belabor this discussion further, however, because a "false accusation of theft is actionable per se—that is, libelous or slanderous per se." Accordingly, Appellants were not required to provide affirmative proof of injury to their reputations in order to recover for the defamatory statements at issue in this case[.]

*Stringer*, 151 S.W.3d at 794-95 (citations and footnotes omitted).

In other words, certain types of statements—including false accusations of theft—are presumed to have damaged the plaintiffs' reputations, and thus no proof of injury resulting from such statements is required: they are "actionable per se." *Id.* "All *other* defamatory statements are merely libelous or slanderous per quod"; these require "affirmative proof of injury to [the plaintiffs'] reputations." *Id.* at 795 (emphasis added). Charter's contention that the per se/per quod determination turns on whether extrinsic proof is needed to interpret the statement as defamatory is thus misguided; it is instead "the proof necessary to demonstrate an injury to reputation" that "varies depending upon the characterization of the defamatory language" as defamation per se or per quod.[5] *Id.* at 794.

―――――――――――――――――

[5] Charter asserts that the confusion arises from the introduction of the concept of libel per quod. (D.N. 183-1, PageID # 4384) However, Professor McCormick identified the problem in his 1935 treatise on damages:

The terminology "actionable per se" has proven treacherous, in that it has invited confusion with another doctrine which obtains in defamation cases. This is the doctrine which distinguishes between words (such as, "You are a thief") which convey a defamatory meaning on their face, and, on the other hand, words of veiled detraction whose offense is apparent only when the context and circumstances are revealed. The former are sometimes said to be defamatory "per se" or slanderous "per se" or libelous "per se," whereas the latter, to be properly pleaded, must have an accompanying "innuendo" or explanation. Clearly this requirement has no relationship to the other rule, that certain slanders are and others are not actionable without a showing of special damage, but the use of the phrase "per se" in both connections has produced confusion, and we find many American courts adopting the practice of requiring, in cases where the defamation, whether slander or libel, must be explained by an "innuendo" to reveal its defamatory meaning, that special

Charter cites two Kentucky cases, *Sweeney & Co. v. Brown*, 60 S.W.2d 381 (Ky. 1933), and *Towles v. Travelers Insurance Co.*, 137 S.W.2d 1110 (Ky. 1940) (which followed *Sweeney*), for the proposition that an ambiguous statement cannot constitute defamation per se. (D.N. 183-1, PageID # 4378-79) Specifically, Charter points to the *Sweeney* court's definition of libel per quod as "words reasonably susceptible of a defamatory meaning as well as an innocent one." (D.N. 183-1, PageID # 4378 (quoting *Sweeney*, 60 S.W.2d at 383)) Such words, according to *Sweeney*, "require evidence of pecuniary loss arising from the use thereof, other than their use to sustain a recovery"; they "may be defamatory by reason of their imputation, or by reason of certain extrinsic facts, connoting they were meant to be, and were, understood by the general public, or those reading them, to have such meaning, and that on receiving them were so construed." 60 S.W.2d at 383 (citations omitted). While Charter presents *Sweeney* as clear authority that has been "followed in Kentucky ever since," resulting in "decades of firmly established Kentucky law," the only other published Kentucky case Charter cites for this proposition is from 1951; the rest are unpublished decisions from the Kentucky Court of Appeals, rulings of this Court, and cases from various other states—none of which, of course, are binding here.[6] (*See* D.N. 183-1, PageID #

---

damages be also pleaded. This is foreign to the common-law tradition, and adds an additional complexity to a subject already overburdened with rules . . . .

Charles T. McCormick, *Handbook on the Law of Damages* § 113, at 417-18 (1935) (footnotes omitted). The *Stringer* opinion, while less than precise in its phrasing, shows that the Kentucky Supreme Court grasps the distinction. *See* 151 S.W.3d at 794-95.

[6] In the 1951 case, *Elkins v. Roberts*, 242 S.W.2d 994 (Ky. 1951), the court described

two classes of actionable words: those slanderous per se, which are presumed by law actually and necessarily to damage the person about whom they are spoken, and those classified as actionable per quod, which on their face are not actionable per se but only in consequence of extrinsic facts show the damages which resulted to the slandered party.

*Id.* at 995. This is consistent with the *Stringer* court's explanation of the distinction between defamation per se and defamation per quod: for the former, damages are presumed; for the latter, damages must be proved. *See Stringer*, 151 S.W.3d at 794-95; *see also Toler*, 458 S.W.3d at 282 ("'[W]ords are said to be actionable per se when there is a conclusive presumption of both malice

4377-82)  Given the Kentucky Supreme Court's equally thorough and far more recent discussion in *Stringer* on facts strikingly similar to those at issue here, the Court finds *Stringer* to be the more relevant precedent.

Like the instant case, *Stringer* involved terminated employees who alleged that they were later falsely painted as thieves by their former employer.  One of the statements at issue was that "there was more to [the plaintiffs' firing] than" eating candy from open bags (known as "claims candy").  151 S.W.3d at 792; *see id.* at 786.  The *Stringer* court concluded that this statement alone was enough to support the jury's finding of defamation per se.[7]  *See id.* at 798-99.

Clearly, the words "there was more to it than that" are not, on their face, defamatory.  Nor was the statement an obvious reference to theft even if placed in context: an assistant manager, "when asked whether [the plaintiffs] had been terminated for eating candy from the claims area, responded [that] '"there was more to it than that" and that he couldn't talk about it.'"  *Id.* at 792.  Indeed, as in this case, the context (with its reference to "claims candy" or "candy from the claims area") likely would not have been understood by a non-employee.  Yet because another employee testified that she interpreted the statement "as an assertion that [the plaintiffs] had stolen items in addition to claims candy," it was sufficient to support a verdict in favor of the plaintiffs.  *Id.* at

---

and damage.' . . . If a communication can be labeled per se defamatory, 'recovery is permitted without proof of special damages because injury to reputation is presumed and the words are actionable on their face.'" (quoting *Stringer*, 151 S.W.3d at 794)).  Notably, the statement at issue in *Elkins*—that the plaintiff had "swor[n] a lie" and would be indicted for it—was found not to constitute slander per se because the plaintiff failed to allege sufficient facts concerning the context in which the statement was made.  *See* 242 S.W.2d at 995-96.

[7] The *Stringer* court's conclusion that the statement, solely by virtue of its apparent falsity, gave rise to a presumption of malice sufficient to overcome the defendant's assertion of qualified privilege was ultimately overruled.  *See Toler*, 458 S.W.3d at 287.  As discussed in Part II.C below, privilege was not at issue in this case.

798. Charter's contention that the jury could not properly consider the context in which "Printer-gate" was discussed is therefore unavailing.

At bottom, the dispute over the characterization of "Printer-gate" is whether it is *actionable* per se or per quod—i.e., whether Plaintiffs should have been required to prove damages. (*See* D.N. 183-1, PageID # 4381-82 (asserting that an ambiguous statement can only constitute defamation per quod and that therefore, "judgment as a matter of law should have been entered for Charter, because Plaintiffs had no evidence of special damages to sustain a claim of defamation per quod")) As explained in *Stringer*, no proof of damages is required where the statement amounts to an accusation of theft, whether direct or indirect. *See* 151 S.W.3d at 795. Charter is thus not entitled to judgment as a matter of law on this ground.

### 3. Jury Determination

Charter further argues that the Court erred by allowing the jury to determine whether the "Printer-gate" reference constituted defamation per se. (D.N. 183-1, PageID # 4376-86) According to Charter, the Court's reliance on *Yancey* was misplaced. (*Id.*, PageID # 4382-86) In *Yancey*, the Kentucky Supreme Court explained that

> [a]lthough it is usually the court's function to determine whether a crime imputed by published statements is actionable as libel per se, where the words at issue are capable of more than one meaning, as they are here, the jury should decide which of the meanings a recipient of the message would attribute to it.

786 S.W.2d at 858 (citing *Deitchman v. Bowles*, 179 S.W. 249 (Ky. 1915); *Beams v. Beams*, 129 S.W. 298 (Ky. 1910)). The *Yancey* court remanded the case with the instruction that should it proceed to trial, "the jury must decide whether the communication in question actually conveyed a defamatory message to the reader." *Id.* at 859.

In Charter's view, this portion of *Yancey* was unnecessary, and the Kentucky Supreme Court could not have meant what it said. In support, Charter again quotes *Stringer* for the

proposition that "a statement is 'merely *libelous or slanderous per quod* . . . if a comprehension of the defamatory nature of the written or spoken words requires extrinsic evidence of context or circumstances.'" (D.N. 183-1, PageID # 4384-85 (emphasis and omission by Charter) (quoting *Stringer*, 151 S.W.3d at 795)) But as explained above, that portion of *Stringer* supports the Court's reasoning, not Charter's. More importantly, *Stringer* upheld a finding of defamation per se based on a statement capable of interpretation as either defamatory or not—and in so doing, it cited *Yancey* and *Deitchman*. *See* 151 S.W.3d at 798-99 & n.63 (citing *Yancey*, 786 S.W.2d at 858; *Deitchman*, 179 S.W. at 249 ("In the absence of accompanying language determining the quality of expressions having two interpretations, one actionable, and the other nonactionable, it is for the jury to determine in which sense the language was spoken.")).

This approach is consistent with the Restatement, which Kentucky courts have long followed in the defamation context. *See Toler*, 458 S.W.3d at 289 (describing Restatement as "an invaluable resource that has been repeatedly cited and relied on throughout the development of our defamation case law"); *see also, e.g.*, *Yancey*, 786 S.W.2d at 857 (adopting Restatement's approach to fact–opinion distinction).[8] Section 615(1) of the Restatement (Second) of Torts provides that "[t]he court determines whether a crime, a disease or a type of sexual misconduct imputed by spoken language is of such a character as to make the slander actionable per se." The comment to that subsection explains: "[I]t is for the judge to determine whether spoken words that are clearly defamatory or that are *or may properly be found by the jury to have been understood in a defamatory sense* are actionable without proof of special harm." Restatement (Second) of Torts § 615 cmt. a (emphasis added). In other words, the Court decides whether a statement is or

---

[8] The *Toler* court referred to a specific section and comment within the Restatement, *see* 458 S.W.3d at 289; however, it appears to have been referring to the value of the Restatement in general, as the section mentioned is not widely cited in Kentucky law.

13

could be defamatory per se; the jury decides whether it was taken as such. *See* Restatement (Second) of Torts § 614 ("The court determines (a) whether a communication is capable of bearing a particular meaning, and (b) whether that meaning is defamatory[; t]he jury determines whether a communication, capable of a defamatory meaning, was so understood by its recipient."). The jury's finding is a factual one: how the statement was interpreted by those who heard it.

Finally, Charter attacks the Court's use of a model jury instruction based on *Yancey*. (D.N. 183-1, PageID # 4385-86) It points out that model instructions are nonbinding and are "rightly rejected" in some cases.[9] (*Id.*, PageID # 4386) While it is true that the model instructions are not binding, nothing suggests that the Court's reliance on them in this instance was improper. Charter has failed to show that *Yancey* should have been disregarded. And as recognized by the Kentucky Supreme Court in one of the cases cited by Charter, Palmore and Cetrulo's *Kentucky Instructions to Juries*—the source utilized in this case—is "a respected and persuasive authority that is regularly consulted and cited by the bench and bar of this state." *Sargent v. Shaffer*, 467 S.W.3d 198, 210 (Ky. 2015).

For all the reasons explained above, Charter is not entitled to judgment as a matter of law.

**B.    Truth Defense**

Charter seeks a new trial on the ground that the Court "erred by granting judgment foreclosing the defense of truth." (D.N. 183-1, PageID # 4386) It contends that this "defense should have gone to the jury as long as there was evidence in the record—from any source— sufficient to permit a reasonable jury to conclude that Plaintiffs' actions met the definition of theft." (*Id.*) The two cases it cites in support of this contention, *Reeves v. City of West Liberty, Kentucky*,

---

[9] Charter relies on a model instruction from the same source later on the same page of its brief. (*See* D.N. 183-1, PageID # 4386)

219 F. Supp. 3d 600, 607 (E.D. Ky. 2016), and *National College of Kentucky, Inc. v. WAVE Holdings, LLC*, 536 S.W.3d 218, 223 (Ky. Ct. App. 2017), state no such rule.  Charter next cites Cetrulo's model instruction for theft by unlawful taking, asserting that "proving the defense of truth simply required evidence from which a jury could conclude" that the three statutory elements of theft were met.  (D.N. 183-1, PageID # 4386)  Those elements, as set out in the criminal pattern instruction, are (1) that Plaintiffs took property that belonged to Charter; (2) that in so doing, they knew the property was not their own and were not acting under a claim of right to it; and (3) that in taking the property, Plaintiffs intended to deprive Charter of it.  *See* 1 Cetrulo, Kentucky Instructions to Juries § 6.19 (2018); Ky. Rev. Stat. § 514.030.

The Court notes that Charter objected at trial to application of the statutory definition of theft (which formed part of the Cetrulo model instruction on defamation per se), and its counsel admitted that no witness had referred to Plaintiffs' conduct as criminal.  (D.N. 173, PageID # 4064-66)  In fact, Charter's company representative, Mike Barnard, testified unequivocally that Plaintiffs "did not have the intent to steal" and did not steal from Charter.  (*Id.*, PageID # 4001)  Each of the plaintiffs testified that there was nothing surreptitious about their taking of the printers; some testified that they didn't even need or want the printers but accepted them at Showalter's repeated urging.  (*See* D.N. 155, PageID # 3323; D.N. 156, PageID # 3351; D.N. 171, PageID # 3628, 3636; D.N. 172, PageID # 3739, 3743, 3791, 3807-09, 3843)  All testified that they believed Showalter's distribution of the printers was authorized by management.  (D.N. 155, PageID # 3322, 3327; D.N. 156, PageID # 3362; D.N. 171, PageID # 3630, 3638; D.N. 172, PageID # 3738-39, 3748, 3796-97, 3802-04, 3820, 3836-37)

Charter nevertheless argues that "there was . . . ample evidence from which the jury could have concluded that the Plaintiffs knew that they did not have legitimate permission to take

company property, and that they did so anyway." (D.N. 183-1, PageID # 4387) In support, it first points to various Charter policies and Plaintiffs' acknowledgment that they failed to independently seek authorization from a manager before accepting the printers. (*Id.*, PageID # 4387-88) According to Charter, "Plaintiffs' decisions *not* to follow known procedures provides evidence that Plaintiffs knew they did not have authorization to take company property and it could give rise to a reasonable inference that Plaintiffs did not ask for authorization because they knew they would not like the answer they would get." (*Id.*, PageID # 4388) Such an inference is not reasonable, however, in light of the overwhelming evidence—including from Charter's own representative—that Plaintiffs lacked criminal intent.

Charter next asserts that Showalter lacked either actual or apparent authority to distribute the printers because "[n]one of the Plaintiffs testified that a manager at Charter suggested to them that Ms. Showalter had authority to give away the printers." (D.N. 183-1, PageID # 4388) Whether the evidence establishes apparent authority as a matter of Kentucky agency law is of little relevance, however. It is now undisputed that Showalter was not authorized to distribute the printers. (*See, e.g.*, D.N. 172, PageID # 3800) The fact that she may have lacked legal authority says nothing about Plaintiffs' state of mind, i.e., whether Plaintiffs "knew the [printers] w[ere] not their own" and thus intended to steal them. 1 Cetrulo, Kentucky Instructions to Juries § 6.19. (*See* D.N. 183-1, PageID # 4387 (acknowledging dispute as to "whether Plaintiffs knew that the printers were not legitimately being transferred to their ownership")) Meanwhile, Plaintiffs' testimony that they believed Showalter was authorized to give them the printers fits neatly into Kentucky's "claim of right" defense to theft, which applies if the defendant "had the permission, or believed he had the permission, of [the victim] or some other person authorized to give permission to take

16

the property."   1 Cetrulo, Kentucky Instructions to Juries § 11.35; *see* Ky. Rev. Stat. § 514.020(1)(b).

Charter's final assertion, that "there was evidence that Plaintiffs knew their conduct was improper, because they *lied* about how they got the printers to make their actions appear legitimate," likewise barely warrants discussion.  (D.N. 183-1, PageID # 4388)  As evidence of Plaintiffs' purported dishonesty, Charter cites an exhibit attached to each plaintiff's interrogatory answers that characterized the printers as having been "apparently passed out as part of an incentive program with the knowledge of management."  (*E.g.*, D.N. 89-14, PageID # 3143) Plaintiffs did not, as Charter implies, admit to "fabricati[ng]" that statement (D.N. 183-1, PageID # 4389); rather, they merely acknowledged that they did not receive the printers through an incentive program.  A generic exhibit attached to discovery responses, drafted by counsel as part of litigation and with the qualifier "apparently," hardly constitutes the sort of "evidence that one has attempted to cover up a crime" that would serve as "circumstantial proof of one's consciousness of guilt."  (D.N. 183-1, PageID # 4388 n.19 (quoting *Collins v. Commonwealth*, No. 2008-SC-000107-MR, 2010 WL 2471839, at *4 (Ky. June 17, 2010)))  Charter further misrepresents the record when it claims, citing the testimony of Kruti Desai and Gale Parkerson, that "Plaintiffs admitted that management had not actually been informed of the printer-distribution scheme" (D.N. 183-1, PageID # 4389):  Desai acknowledged that she *now* knows that managers were not aware that she had taken printers (D.N. 172, PageID # 3776), while Gale Parkerson agreed that Charter ultimately determined that Showalter lacked authority to distribute the printers (*id.*, PageID # 3800).

In sum, there was insufficient evidence for the jury to reasonably find that Plaintiffs intended to steal the printers, and the Court thus did not err in granting judgment as a matter of law on the issue of truth. Charter is not entitled to a new trial on this ground.

### C. Qualified Privilege

Charter next argues that it should have been permitted to assert the defense of qualified privilege. (D.N. 183-1, PageID # 4389-98) Charter sought leave to amend its answer to assert qualified privilege after the deadline for amendment of pleadings had passed. (D.N. 48) Magistrate Judge Dave Whalin denied the motion (D.N. 59), and the Court overruled Charter's objection to that ruling. (D.N. 81) In its post-trial motion, Charter argues for the first time that amendment was not required, and it again challenges the denial of its request to amend. (D.N. 183-1, PageID # 4389-95)

#### 1. Necessity of Amendment

Charter characterized qualified privilege as an affirmative defense in its motion for leave to amend. (D.N. 48, PageID # 333 (seeking "leave to amend its Answer to assert an additional affirmative defense")) Nothing in that motion or the supporting memorandum indicated uncertainty as to whether amendment was necessary in order to assert the privilege. (*See generally id.*; D.N. 48-1) Indeed, Charter pursued untimely amendment with remarkable determination, renewing the motion before its objection to the magistrate judge's ruling on the first motion had been resolved and again during trial. (D.N. 61; D.N. 149) Now, however, Charter contends that amendment was unnecessary because Plaintiffs were on notice all along that Charter intended to rely on this defense and would not have been prejudiced by its addition. Charter further suggests that Plaintiffs bore the burden of proving the absence of privilege regardless of Charter's pleading. (D.N. 183-1, PageID # 4390)

### a. Whether Qualified Privilege Is an Affirmative Defense Under Kentucky Law

"Federal law governs whether a defense has been waived in federal court, but state law governs which defenses must be pleaded affirmatively to avoid waiver." *Brent v. Wayne Cty. Dep't of Human Servs.*, 901 F.3d 656, 680 (6th Cir. 2018) (citing *Roskam Baking Co. v. Lanham Mach. Co.*, 288 F.3d 895, 901 (6th Cir. 2002)). The Court rejects Charter's suggestion that qualified privilege is not an affirmative defense under Kentucky law. While Charter appears to be correct that "no Kentucky case has ever definitively held that qualified privilege must be affirmatively pled" (D.N. 183-1, PageID # 4393), the existing caselaw strongly indicates that qualified privilege is an affirmative defense. For example, in the case primarily relied on by Charter, the Kentucky Court of Appeals acknowledged that the plaintiff's argument "that privilege is an affirmative defense which . . . must be pled or lost" would have been meritorious had the facts of the case not warranted an exception to that rule. *Columbia Sussex*, 627 S.W.2d at 275.

As evidence that Plaintiffs bore the burden of proving that no privilege existed, Charter also points to *Toler* and other Kentucky cases in which the court listed "unprivileged publication" as an element of defamation. (D.N. 183-1, PageID # 4390) Those elements come from the Restatement. *See, e.g.*, *Toler*, 458 S.W.3d at 282 n.9 (quoting Restatement (Second) of Torts § 558). The Restatement further provides that "[i]n an action for defamation the defendant has the burden of proving, when the issue is properly raised, the presence of the circumstances necessary for the existence of a privilege to publish the defamatory communication."[10] Restatement

---

[10] Section 613(1) states that "the plaintiff has the burden of proving, *when the issue is properly raised*, . . . the abuse of a conditional privilege." Restatement (Second) of Torts § 613(1) (emphasis added); *see id.* cmt. g ("If [the defendant] relies upon the defense [of conditional privilege], he . . . has the burden of proving it. If he sustains this burden . . . , he will prevail unless the plaintiff takes up and sustains the burden of proving that the privilege was abused.").

(Second) of Torts § 613(2); *see also id.* cmt. i ("The burden of proving that the publication of the defamatory matter was privileged is upon the defendant."). Thus, Kentucky courts' reliance on the Restatement standard undermines, rather than supports, Charter's position.

Furthermore, *Toler* confirms that absent abuse, the privilege relieves a defendant of liability for "otherwise defamatory-per-se communications." 458 S.W.3d at 282. In other words, "once a qualified privilege attaches, even 'false and defamatory statements will not give rise to a cause of action unless maliciously uttered.'" *Harstad*, 338 S.W.3d at 813 (emphasis removed) (quoting *Stewart v. Williams*, 218 S.W.2d 948, 950 (Ky. 1949)); *see also Toler*, 458 S.W.3d at 283-84 ("A defendant who enjoys the qualified privilege may make defamatory statements, 'unless maliciously uttered.'" (quoting *Stewart*, 218 S.W.2d at 950)). This is the very definition of an affirmative defense: "A defendant's assertion of facts and arguments that, if true, will defeat the plaintiff's or prosecution's claim, even if all the allegations in the complaint are true." *Affirmative Defense*, Black's Law Dictionary (10th ed. 2014). In sum, the Court is confident that Charter was required to affirmatively plead the defense of qualified privilege.

### b. Whether Charter Waived the Privilege by Failing to Affirmatively Plead It

"Generally, a failure to plead an affirmative defense . . . results in the waiver of that defense." *Henricks v. Pickaway Corr. Inst.*, 782 F.3d 744, 750 (6th Cir. 2015) (omission in original) (quoting *Phelps v. McClellan*, 30 F.3d 658, 663 (6th Cir. 1994)). Because the issue of waiver is decided under federal law, *Brent*, 901 F.3d at 680, the Court will not consider the Kentucky precedent cited by Charter as to whether it waived the privilege. (*See* D.N. 183-1, PageID # 4390 (citing *Columbia Sussex*, 627 S.W.2d at 275)) The Sixth Circuit has stated that "if a plaintiff receives notice of an affirmative defense by some means other than pleadings, the defendant's failure to comply with Rule 8(c) does not cause the plaintiff any prejudice." *Brent*,

901 F.3d at 680 (quoting *Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1445 (6th Cir. 1993)). However, a finding of waiver is appropriate "even without a showing of prejudice" when a defendant "has failed to show 'that it even made a good faith effort to comply with the standard procedure for raising affirmative defenses.'" *Henricks*, 782 F.3d at 751 (quoting *U.S. Fire Ins. Co. v. City of Warren*, 87 F. App'x 485, 491 (6th Cir. 2003)); *see id.* ("When the defendant is unable to offer any reasonable explanation for its tardiness in presenting a defense, finding waiver is not an abuse of discretion.").

Charter has offered no excuse for its failure to affirmatively plead qualified privilege. Nevertheless, it maintains that "Plaintiffs plainly were on notice that Charter intended to pursue" a qualified-privilege defense because of correspondence they received from Charter's counsel in the summer of 2015. (D.N. 183-1, PageID # 4390; *see id.*, PageID # 4391) Specifically, Charter points to a June 24, 2015 letter to Plaintiffs' then-counsel stating, as part of a list of purported deficiencies in Plaintiffs' remaining claims, that "Plaintiffs will not be able to demonstrate malice, and Charter will be able to claim a qualified privilege as a result of any alleged statements made" (D.N. 49-1, PageID # 341), and an August 5, 2015 letter forwarding the same to Plaintiffs' current counsel (D.N. 49-2).[11] (D.N. 183-1, PageID # 4391)

Plaintiffs have stated that they viewed the June 24 letter as mere "posturing" by Charter and thus assigned it no legal significance. (D.N. 53, PageID # 382; *see* D.N. 186, PageID # 4491 ("Plaintiffs got a letter threatening privilege but then no pleading of qualified privilege was ever filed.")) Charter scoffs at this view, yet it has admitted that its purpose in sending the letter was

---

[11] Contrary to Charter's assertion, the August 5 correspondence did not "again advis[e] Plaintiffs of Charter's intent to pursue a qualified privilege defense" (D.N. 183-1, PageID # 4391); rather, it merely noted that the earlier letter had "provided relevant case law regarding Plaintiffs' remaining claims." (D.N. 49-2, PageID # 343)

"to convince Plaintiffs to dismiss their remaining claims." (D.N. 55, PageID # 431; *see* D.N. 183-1, PageID # 4391) Moreover, the phrasing used ("Charter *will be able to* claim a qualified privilege") merely raised the possibility that the defense would be asserted. (D.N. 49-1, PageID # 341 (emphasis added)) Read in context, the letter's reference to privilege is nothing more than an attempt to persuade Plaintiffs that their remaining claims were futile—and indeed, that is precisely what it was intended to convey. (*See* D.N. 55, PageID # 431)

Clearly, the June 24 letter was not meant to serve as a formal assertion of qualified privilege. Plaintiffs thus cannot be faulted for failing to construe it as one. They could reasonably have assumed, when the amendment deadline came and went one month later, that Charter did not actually intend to assert the defense. *See Henricks*, 782 F.3d at 751 (where defendants "asserted an affirmative defense in a motion to dismiss but did not object when the magistrate judge ignored the defense and did not file an answer or other responsive pleading," plaintiff "could fairly conclude . . . that [defendants] did not intend to assert the qualified immunity defense"). The fact that Charter had not mentioned qualified privilege in its answer or sought dismissal of the defamation claim on privilege grounds would have further supported this assumption. *Cf. Brent*, 901 F.3d at 680 (finding that plaintiff was on notice of immunity defense where defendant did not assert defense in its answer but did "raise the defense in its first filing with the district court following [the plaintiff's] filing of his amended complaint," i.e., its motion to dismiss).

Although the Sixth Circuit has occasionally excused failure to plead an affirmative defense on the ground that the plaintiff had sufficient notice, in each of those cases the defendant had asserted the defense in a court filing. *See id.*; *Smith v. Sushka*, 117 F.3d 965, 969 (6th Cir. 1997) (finding that plaintiff had sufficient notice and opportunity to respond to affirmative defense raised in defendant's second motion for summary judgment); *Moore, Owen, Thomas & Co.*, 992 F.2d at

1445 (concluding that counterclaimants "were aware, or at least should have been aware," that opposing party "intended to rely on a fraud defense" where he "raised the issue of fraud in his response to the[ir] motion for summary judgment and in his affidavit in opposition to the[ir] motion"); *Pierce v. Cty. of Oakland*, 652 F.2d 671, 672 (6th Cir. 1981) (citing Sixth Circuit and district-court cases holding that "an affirmative defense is not waived, even though not specifically pleaded, where the defense clearly appears on the face of the pleading and is raised in a motion to dismiss"). Even asserting the affirmative defense in a motion to dismiss was not enough in *Henricks*, however, where the defendant took no further action with respect to the defense. *See* 782 F.3d at 751. In light of this precedent, and in the absence of any other indication that Charter intended to pursue a qualified-privilege defense, the Court cannot find a passing mention in a letter from counsel to constitute sufficient notice.

Nor is the Court convinced by Charter's contention that Plaintiffs' discovery requests show that they were on notice of the qualified-privilege defense. (D.N. 183-1, PageID # 4391-93) The fact that some of Plaintiffs' discovery requests or deposition questions might have yielded information that could have been used to rebut the privilege does not mean that Plaintiffs "were preparing to rebut a qualified privilege defense" (*id.*, PageID # 4391); the questions identified by Charter were relevant to other topics regardless of whether privilege was at issue. (*See id.*, PageID # 4392-93) Finally, given the presumption of prejudice recognized in *Henricks*, Plaintiffs were not required to identify "*actual* discovery that [they] were unable to pursue," Charter's liberal use of italics notwithstanding. (D.N. 183-1, PageID # 4394 ("Plaintiffs failed to identify *any* specific discovery that they were not able to pursue. . . . [The magistrate judge] did not point to a *single* example of discovery that Plaintiffs had not pursued. . . . The Court concluded that there was prejudice solely on the basis that Plaintiffs '*could* have reasonably assumed that [Charter] had

decided not to pursue this defense.'" (final alteration in original) (quoting D.N. 81, PageID # 1429); *see also* D.N. 188, PageID # 4555-56)  The Court thus concludes that Charter waived the defense of qualified privilege by failing to assert it in a responsive pleading.

## 2.    Denial of Amendment

The deadline for amendment of pleadings, as agreed by the parties, was July 24, 2015. (D.N. 22, PageID # 129)  Because Charter did not seek leave to amend its answer until nearly five months after that deadline, it was first required to show "good cause" to amend the scheduling order under Federal Rule of Civil Procedure 16.  *See Leary v. Daeschner*, 349 F.3d 888, 909 (6th Cir. 2003).  Charter's motion for leave to amend did not address the belated nature of the request, nor did it cite Rule 16.  (*See* D.N. 48; D.N. 48-1)  In its post-trial briefing, Charter mocks the Court's supposedly "mistaken insistence" on a showing that the existing amendment deadline could not "reasonably be met."  (D.N. 188, PageID # 4555; *see also* D.N. 183-1, PageID # 4397 ("[T]he Court concluded that Charter had to satisfy an iron-clad requirement showing why the existing deadline 'cannot reasonably be met.'"))  Yet that is the standard set by the advisory committee and adopted by the Sixth Circuit.  *See Leary*, 349 F.3d at 906 ("[A] court choosing to modify the schedule upon a showing of good cause[] may do so only 'if it cannot reasonably be met despite the diligence of the party seeking the extension.'" (quoting Fed. R. Civ. P. 16 1983 advisory committee's note); *id.* at 907 ("[M]odification is permitted under Rule 16 if Plaintiffs can demonstrate 'good cause' for their failure to comply with the original schedule, by showing that despite their diligence they could not meet the original deadline." (citations omitted)); *see also Ross v. Am. Red Cross*, 567 F. App'x 296, 306 (6th Cir. 2014) (applying standard and finding no abuse of discretion in denial of motion for leave to amend filed after amendment deadline); *Marcilis v. Twp. of Redford*, 693 F.3d 589, 597 (6th Cir. 2012) (applying standard and finding no

abuse of discretion in denial of motion to extend deadlines).  And the Sixth Circuit has repeatedly

found that a party "does not establish 'good cause' to modify a case schedule to extend the deadline

to amend the pleadings where [it] was aware of the facts underlying the proposed amendment to

[its] pleading but failed, without explanation, to move to amend . . . before the deadline." *Ross*,

567 F. App'x at 306 (collecting cases); *see also Newburgh/Six Mile L.P. II v. Adlabs Films USA,

Inc.*, 483 F. App'x 85, 94 (6th Cir. 2012) ("Because Adlabs was aware of the basis for

its . . . affirmative defense for many months and did not pursue it until [more than four months

after the deadline], it cannot demonstrate that 'despite [its] diligence [it] could not meet the original

deadline,' and therefore cannot establish the good cause necessary to support modification of the

scheduling order." (alterations in original)).  Thus, despite Charter's attempts to place the burden

on Plaintiffs to show that they were not prejudiced by its delay in seeking amendment, its failure

to provide any excuse for the delay is largely dispositive: ultimately, "prejudice to [the nonmoving

party] is merely a consideration that informs whether [the movant] has satisfied the 'good cause'

requirement of the *Leary* standard."[12]  *Korn v. Paul Revere Life Ins. Co.*, 382 F. App'x 443, 450

(6th Cir. 2010) (per curiam) (finding good-cause standard unmet even if there were no prejudice

to opposing party where plaintiff did not "explain why he failed to move for the amendment at a

time that would not have required a modification of the scheduling order"); *see Ross*, 567 F. App'x

at 306-07; *Newburgh/Six Mile*, 483 F. App'x at 93-94; *Leary*, 349 F.3d at 906-08.

---

[12] Charter's claim that it "addressed its diligence in adhering to deadlines in its original motion as it explained that there had been no undue delay in seeking leave to amend and that there had not been any prior non-compliance with any case deadlines" is unpersuasive.  (D.N. 183-1, PageID # 4396-97)  A conclusory assertion that there has been no "undue delay" (D.N. 49, PageID # 338) is not equivalent to a "showing that despite [the party's] diligence [it] could not meet the original deadline." *Leary*, 349 F.3d at 907.  Charter's perfunctory mention of undue delay was in the context of its attempt to show that amendment was appropriate under the lenient Rule 15 standard, not that amendment of the litigation schedule was warranted under Rule 16.  (*See* D.N. 49, PageID # 336-37)

Moreover, Plaintiffs would have been prejudiced by the delayed amendment. Privilege—or rather, the absence thereof—was not an essential element of Plaintiffs' case, *see supra* Part II.C.1.a; they thus were not otherwise obligated to pursue discovery on that topic. The fact that evidence relevant to existing claims and defenses may also have been relevant to qualified privilege does not mean that Plaintiffs had all the discovery they wanted or needed to rebut a privilege defense. (*See* D.N. 186, PageID # 4490) Furthermore, Charter disclosed a list of 67 potential witnesses—Charter employees who attended the leadership conference—just days before it sought leave to amend and only a few weeks before the discovery deadline. (*See* D.N. 53, PageID # 383; D.N. 186, PageID # 4490-91) As the Court noted in a previous decision, "[P]laintiffs understandably view this as a strategic move connected to the last-minute attempt to assert qualified privilege and designed to give Charter an unfair advantage" (D.N. 81, PageID # 1429), either by delaying the trial or by preventing Plaintiffs from deposing those witnesses altogether. (*See* D.N. 186, PageID # 4490-91) Because Charter's belated amendment, if allowed, would likely have required extension of the discovery deadline for additional, costly discovery so that Plaintiffs could attempt to rebut the qualified-privilege defense, the prejudice consideration also disfavors amendment. *See Newburgh/Six Mile*, 483 F. App'x at 93-94 (prejudice shown where plaintiff "would need to move the court to reopen discovery, and . . . then need to expend further resources to engage in additional discovery in order to address the new counterclaim and affirmative defense"); *Leary*, 349 F.3d at 908-09 (prejudice shown where if amendment were permitted, "discovery w[ould] have to be reopened" and defendant would have to prepare defense to new claim).

The Court recognizes that availability of the qualified-privilege defense could have drastically altered the outcome of this case. An inexplicable oversight or strategic error on

Charter's part, however, does not justify altering the litigation schedule or depriving Plaintiffs of necessary discovery in disregard of Sixth Circuit law and the Federal Rules of Civil Procedure. Given Charter's failure to assert qualified privilege in its answer, a timely amended answer, or a motion to dismiss, it is reasonable to conclude that omission of the defense earlier in the case was intentional. Yet Charter now essentially asks the Court to allow it the benefit of hindsight—to benefit both from asserting the defense, and from not asserting it. Charter is not entitled to a new trial on this ground.

### D.    Testimony of James Eversole

Charter next argues that James Eversole's testimony should have been excluded because it was obtained in violation of Kentucky Supreme Court Rule 3.130(4.2). (D.N. 183-1, PageID # 4398-4401) In support, Charter cites three Kentucky cases and one unpublished decision by another judge of this Court. (*Id.*, PageID # 4398-99) With respect to evidentiary matters, the Court applies federal law. *See Back v. Nestlé USA, Inc.*, 694 F.3d 571, 578 n.2 (6th Cir. 2012) ("[F]ederal law governs the admissibility of evidence in diversity cases." (citing *Laney v. Celotex Corp.*, 901 F.2d 1319, 1320 (6th Cir. 1990))); *see also* Fed. R. Evid. 1101(a)-(b) (Federal Rules of Evidence apply to civil cases in federal district courts). The Kentucky Supreme Court's conclusion in *Shoney's, Inc. v. Lewis*, 875 S.W.2d 514 (Ky. 1994), that "the only satisfactory remedy is suppression" of statements obtained in violation of Rule 4.2, *id.* at 516, is thus inapplicable here.[13] (*See* D.N. 183-1, PageID # 4398 (citing *Shoney's*, 875 S.W.3d at 516))

---

[13] Charter also cites *Sipes v. Kentucky Bar Ass'n*, 290 S.W.3d 650 (Ky. 2009)—an attorney disciplinary proceeding in which the court merely observed that "the [trial] judge excluded the interview" conducted in violation of Rule 4.2, a decision that was "not appeal[ed]," *id.* at 651— and *Ridgeway Nursing & Rehabilitation Facility, LLC*, 415 S.W.3d 635 (Ky. 2015). Charter misrepresents the latter case. The Kentucky Supreme Court did not "sa[y] that the court should 'suppress *any evidence resulting from* unethical contacts.'" (D.N. 183-1, PageID # 4399) (emphasis by Charter) (quoting *Ridgeway*, 415 S.W.3d at 640)) Rather, the court found that the

No federal rule of evidence provides that evidence obtained in violation of an ethics rule is inadmissible.[14]  Although the Court's Local Rules incorporate the state rules of professional conduct, the penalty for violation of those rules is attorney discipline, not suppression of evidence. *See* LR 83.3(c).  In the single federal case cited by Charter, *Hornick v. American Commercial Barge Line*, No. 5:07CV-140R, 2008 U.S. Dist. LEXIS 41286 (W.D. Ky. May 23, 2008), Judge Russell concluded in the final sentence of his opinion, without citation, that if the plaintiff's counsel obtained an ex parte statement from the defendant's employee "that would constitute an admission of" the defendant under Federal Rule of Evidence 801(d)(2)(D), "such statement shall be inadmissible into evidence as a statement or admission of" the defendant. *Id.* at *14.  No contact with a potentially represented party had yet occurred; the matter came before the Court on a motion for a protective order to prevent such contact.  *See id.* at *1.  Exclusion of improperly obtained evidence was thus the contemplated remedy for a hypothetical violation of Rule 4.2, not a sanction imposed after the fact.  *See id.* at *13-*14.  While the Court may have had the power to exclude such evidence, *see Insituform of N. Am., Inc. v. Midwest Pipeliners, Inc.*, 139 F.R.D. 622, 624 (S.D. Ohio 1991), no binding authority provides that exclusion of otherwise-admissible evidence obtained in violation of the rule is required or even appropriate.  *See Shoney's*, 875 S.W.2d at 517-18 (Leibson, J., dissenting).

In essence, Charter seeks to relitigate its objection to Judge Whalin's denial of its motion to strike Eversole's affidavit.  (*See* D.N. 183-1, PageID # 4399-4401)  But its objection was

---

defendant had "at least two viable options for redress" short of a writ of mandamus because it would be able to appeal any trial grievances and "[t]he trial court [had] stated in no uncertain terms that it [would] suppress any evidence resulting from unethical contacts."  *Ridgeway*, 415 S.W.3d at 640; *see id.* at 641.

[14] The same is apparently true under Kentucky law, as discussed in Justice Leibson's strongly worded dissent in *Shoney's*.  *See* 875 S.W.2d at 517-18 (Leibson, J., dissenting).

similarly uncompelling.  As the objecting party, Charter bore the burden to "show that the magistrate[ judge]'s order [was] clearly erroneous or contrary to law."  28 U.S.C. § 636(b)(1)(A). The sum of Charter's objection regarding the Eversole affidavit was a paraphrasing of Rule 4.2 followed by the assertion that Plaintiffs

> (1) knew [Eversole] was a managerial employee; (2) knew that as a Charter managerial employee he was represented in this matter, and (3) never attempted to seek Charter's consent before communicating with Eversole.  Since Plaintiffs never sought or obtained permission to speak with Eversole, the denial of Charter's motion to strike his wrongfully obtained affidavit was clearly erroneous and should be overruled.[15]

(D.N. 105, PageID # 2438; *see id.*, PageID # 2437)  Charter did not attempt to explain why exclusion of the evidence was appropriate, nor did it cite any authority to that effect.  (*See id.*, PageID # 2437-38)  The Court was not obligated to address the issue sua sponte.  *See* 28 U.S.C. § 636(b)(1)(A).  Charter failed to demonstrate, then or now, that Eversole's testimony was inadmissible.

### E.    Punitive Damages

Charter contends that the award of punitive damages in this case violates Kentucky's punitive-damages statute, Ky. Rev. Stat. § 411.184, and it asks that the Court strike the award or grant a new trial on this ground.  (D.N. 183-1, PageID # 4402-04)  In the alternative, Charter seeks reduction of the punitive-damages award, which it asserts is unconstitutionally excessive.  (*Id.*, PageID # 4404-06)  The Court agrees with the latter contention.

---

[15] Charter's original argument regarding Eversole's affidavit was similarly sparse—a single paragraph in its motion to strike stating that Plaintiffs were obligated but failed to obtain Charter's permission before speaking with Eversole; briefly discussing *Hornick*; and concluding: "Because Plaintiffs' counsel did not obtain permission from Charter before speaking with Eversole, his affidavit should be stricken in its entirety, as it constitutes inadmissible hearsay."  (D.N. 95-1, PageID # 2348; *see id.*, PageID # 2347)

### 1.   Ky. Rev. Stat. § 411.184

Kentucky's punitive-damages statute provides that "[a] plaintiff shall recover punitive damages only upon proving, by clear and convincing evidence, that the defendant from whom such damages are sought acted toward the plaintiff with oppression, fraud or malice."  Ky. Rev. Stat. § 411.184(2).  The statute further states that it "is applicable to all cases in which punitive damages are sought and supersedes any and all existing statutory or judicial law insofar as such law is inconsistent with the provisions of this statute."  Ky. Rev. Stat. § 411.184(5).  According to Charter, the Court erred in not instructing the jury that it must find oppression, fraud, or malice by clear and convincing evidence in order to award punitive damages.  (D.N. 183-1, PageID # 4402-04)

"A party is not entitled to a new trial based upon alleged deficiencies in the jury instructions unless the instructions, taken as a whole, are misleading or give an inadequate understanding of the law."  *Wesley v. Campbell*, 864 F.3d 433, 441 (6th Cir. 2017) (quoting *Miami Valley Fair Hous. Ctr., Inc. v. Connor Grp.*, 725 F.3d 571, 579 (6th Cir. 2013)).  Notwithstanding § 411.184(5), the Kentucky Supreme Court and Court of Appeals have continued to recognize the "conclusive presumption" of malice in cases of defamation per se.  *See, e.g.*, *Toler*, 458 S.W.3d at 282 (quoting *Stringer*, 151 S.W.3d at 794); *Fortney v. Guzman*, 482 S.W.3d 784, 790 (Ky. Ct. App. 2015) (quoting *Toler*, 458 S.W.3d at 282); *see also Stringer*, 151 S.W.3d at 794 n.43 ("If the word or words charged are actionable per se, the law presumes malice, and punitive damages may be recovered." (quoting *Ray v. Shemwell*, 217 S.W. 351, 353 (1919))).[16]  The Court's instruction to

---

[16] *Stringer* involved a punitive-damages award of $3 million.  *See* 151 S.W.3d at 786.  Despite that sizeable amount, the Kentucky Supreme Court remanded the case for retrial on damages without any suggestion that the jury should have been required to make a separate finding of malice.  *See id.* at 801-02.

the jury was consistent with this precedent as well as the Kentucky Constitution, which provides that "every person . . . shall have remedy by due course of law" for injury to reputation. Ky. Const. § 14. Although § 411.184(5) purports to "nullify existing statutory or case law," "[a] statute . . . cannot negate rights granted by the Constitution." *In re Air Crash at Lexington, Ky.*, No. 5:06-CV-316-KSF, 2008 U.S. Dist. LEXIS 44888, at *45 (E.D. Ky. June 6, 2008) (citing *Commonwealth v. O'Harrah*, 262 S.W.2d 385, 389 (Ky. 1953)) (finding § 411.184(5) ineffective as a limit on right to recovery guaranteed by the Kentucky Constitution). The Court therefore concludes that its instruction on punitive damages was not "misleading," nor did it "give an inadequate understanding of the law," *Wesley*, 864 F.3d at 441, such that a new trial is warranted. (*See* D.N. 167, PageID # 3522 (allowing award of punitive damages "[i]f you find for a plaintiff and award damages to that plaintiff" for defamation per se))

### 2. Constitutionality of Punitive-Damages Award

Charter also challenges the punitive-damages award of $1 million per plaintiff as unconstitutionally excessive; it seeks reduction of that award to reflect a 1:1 ratio of punitive to compensatory damages. (D.N. 183-1, PageID # 4404-06) The Supreme Court has identified three "guideposts" for determining whether a punitive award should be reduced to satisfy due process: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003) (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996)). Using these guideposts, the Sixth Circuit has reversed punitive-damages awards as unconstitutionally excessive on numerous occasions, frequently finding a 1:1 punitive-to-compensatory ratio appropriate. *See,*

*e.g.*, *Morgan v. N.Y. Life Ins. Co.*, 559 F.3d 425, 442-43 (6th Cir. 2009); *Bridgeport Music, Inc. v. Justin Combs Publ'g*, 507 F.3d 470, 486-90 (6th Cir. 2007); *Bach v. First Union Nat'l Bank*, 486 F.3d 150, 156-57 (6th Cir. 2007); *see also Burton v. Zwicker & Assocs.*, 577 F. App'x 555, 564 (6th Cir. 2014) (concluding that district court correctly reduced punitive award to 1:1 ratio despite jury's finding that defendant acted with "intentional malice"); *cf. Wesley v. Campbell*, 864 F.3d 433, 438, 444-45 (6th Cir. 2017) (finding punitive damages of $500,000 constitutional in conjunction with compensatory damages of $589,000). The Court finds that to be the appropriate course here as well.

Reprehensibility is the most important of the three guideposts. *See State Farm*, 538 U.S. at 419. In evaluating "the degree of reprehensibility of the defendant's conduct," *id.* (quoting *Gore*, 517 U.S. at 575), the Court must consider whether

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident. The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect.

*Id.* (internal citations omitted) (citing *Gore*, 517 U.S. at 575-77) In this case, only the final factor weighs in Plaintiffs' favor: the defamatory statement was not "the result of . . . mere accident." *Id.* Thus, Charter's reprehensibility is relatively low. *See id.*

Given the low reprehensibility and "substantial" compensatory award of $350,000 per plaintiff, the 2.9:1 punitive-to-compensatory ratio in this case, while not extreme, is excessive.[17] *Id.* at 425 ("When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee."); *see*

---

[17] The third *State Farm* guidepost, comparable civil penalties, is inapplicable here.

*Burton*, 577 F. App'x at 564; *Bach*, 486 F.3d at 156. The Court agrees with Charter that a 1:1 ratio is more appropriate. (*See* D.N. 183-1, PageID # 4406) The punitive-damages award will therefore be reduced to $350,000 per plaintiff.

####     F.     Compensatory Damages

Charter asserts that the Court "should also reduce the compensatory award because it is plainly excessive and because Plaintiffs caused their own damage." (D.N. 183-1, PageID # 4407) In support, it cites cases from Louisiana, New York, Virginia, Puerto Rico, and Texas. (*See id.*, PageID # 4407-08 & n.34) Kentucky law governs here, however. *See Gasperini v. Ctr. For Humanities*, 518 U.S. 415, 437-38 (1996). Under Kentucky law,

> [a] verdict is excessive . . . if it "cause[s] the mind at first blush to conclude that it was returned under the influence of passion or prejudice on the part of the jury." Even if liberal, an award that does not shock the conscience or is not clearly excessive may not be set aside.

*CSX Transp., Inc. v. Begley*, 313 S.W.3d 52, 69 (Ky. 2010) (alteration in original) (internal citation omitted) (quoting *Louisville & Nashville R.R. Co. v. Mattingly*, 339 S.W.2d 155, 160-61 (Ky. 1960)). In other words,

> "[t]he amount of damages is a dispute left to the sound discretion of the jury, and its determination should not be set aside merely because [the court] would have reached a different conclusion." Instead, "their decision should be disturbed only in the most egregious circumstances." Courts must refrain from disturbing the jury's assessment of damages "[i]f the verdict bears any relationship to the evidence of loss suffered."

*Asbury Univ. v. Powell*, 486 S.W.3d 246, 264 (Ky. 2016) (alterations in original) (internal citations omitted).

Kentucky courts are particularly hesitant to second-guess the jury in defamation cases:

> In cases of defamation the courts tenaciously hold the parties to the damages found by the jury, because there is no scale by which the damages can be graduated with certainty and they admit of no other tests than the intelligence of the jury governed by a sense of justice.

*Tucker v Kilgore*, 388 S.W.2d 112, 116 (Ky. 1964) (quoting 35 A.L.R.2d 218, 222); *see also Miller v. Woods*, 338 S.W.2d 412, 413 (Ky. 1960) ("In [defamation cases] there is no rule of law fixing the measure of damages just as there is no rule by which damages for pain and suffering can be measured. Nor can the damages be ascertained by any process of computation."). Kentucky's highest court noted in *Miller* that "in cases wherein the defamation imputed involvement in crime, [it] as well as other courts have sustained rather liberal awards of damages." 338 S.W.2d at 413 (collecting cases). Plaintiffs cite more recent examples in their response brief. (*See* D.N. 186, PageID # 4503)

The verdict here is not clearly excessive. There is evidence to support the jury's award of compensatory damages as to each plaintiff. According to the testimony at trial, Plaintiffs had all worked at Charter for several years, some for more than a decade. (D.N. 155, PageID # 3319-20; D.N. 156, PageID # 3349-50; D.N. 171, PageID # 3625; D.N. 172, PageID # 3736, 3788-89, 3805, 3834) All testified that they experienced distress, embarrassment, humiliation, lack of sleep, or some combination of these as a result of the "Printer-gate" reference. (D.N. 155, PageID # 3332-33; D.N. 156, PageID # 3355-56; D.N. 171, PageID # 3633-34; D.N. 172, PageID # 3747, 3794, 3811-12, 3843-44) Several described the experience as "demoralizing" or confidence-shaking. (D.N. 155, PageID # 3333; D.N. 156, PageID # 3358; D.N. 172, PageID # 3812) Some felt angry or betrayed. (D.N. 155, PageID # 3332-33; D.N. 172, PageID # 3746-47, 3813) Many testified that they had lost friends over the incident and that former coworkers began avoiding them. (D.N. 155, PageID # 3335-36; D.N. 156, PageID # 3358-59; D.N. 172, PageID # 3747-49, 3793-94, 3844) Two moved out of state because they felt they needed a fresh start. (D.N. 155, PageID # 3329, 3334-35; D.N. 156, PageID # 3359-60) Those still in the Louisville area worry about how they are perceived by employers or colleagues past, present, and potential. (D.N. 171, PageID #

3634-35; D.N. 172, PageID # 3749-50, 3844)  There thus was ample evidence that Plaintiffs suffered compensable "embarrassment, humiliation, and mental anguish."  (D.N. 167, PageID # 3521)

*Boris v. Choicepoint Services*, relied on by Charter, is easily distinguishable.  (*See* D.N. 183-1, PageID # 4407)  The plaintiff in that case sought damages for injury to her business reputation and creditworthiness under the Fair Credit Reporting Act, not for defamation.  249 F. Supp. 2d 851, 860-61 (W.D. Ky. 2003).  The loss of reputation in *Boris* arose out of insurance claims falsely attributed to the plaintiff on a claims-history report prepared by the defendant, and the only evidence the Court could identify to support business-reputation damages was the plaintiff's testimony that two insurance companies "turned her down when she requested insurance."  *Id.* at 861.  There is a significant difference between being assigned an inaccurate insurance-claim history on a credit report and being implicitly labeled a thief in front of dozens of former colleagues.  Moreover, the damages here were meant to compensate Plaintiffs for embarrassment, humiliation, and mental anguish in addition to reputational injury, which was presumed.  *Cf. id.* ("It is important to remember that damages for emotional distress and damages for business reputation are based on entirely different evidentiary foundations.").

Nor will the Court reduce the compensatory damages on the ground that Plaintiffs "caused their own damage," as Charter suggests.  (D.N. 183-1, PageID # 4407)  In Charter's view, a text message sent by Plaintiff Dan Popp to a Charter employee the day after his termination shows that "Plaintiffs themselves were the first to spread the story that the company supposedly thought they 'stole' the printers."  (*Id.*, PageID # 4408)  The text message is insignificant.  There was no evidence that anyone other than the recipient ever saw or heard about it.  And even if it had been publicized, the reference to "Printer-gate" during Simms's presentation could have been construed

as confirmation that the company considered Plaintiffs to have stolen the printers. Because the compensatory-damages award is supported by the evidence, that portion of the jury's verdict will not be set aside.

## III. CONCLUSION

For the reasons set forth above, and the Court being otherwise sufficiently advised, it is hereby

**ORDERED** that Charter's motion for judgment as a matter of law or, in the alternative, for a new trial (D.N. 183) is **GRANTED** to the extent Charter seeks reduction of the punitive-damages award. Within **ten (10) days** of the date of entry of this Order, Plaintiffs shall notify the Court whether they will accept an award of $350,000 in punitive damages per plaintiff. Charter's motion is **DENIED** in all other respects.